UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

**JEANETTE MARIE HENTZE,**

    **Plaintiff,**

v.                                                                            Civil Action No. 2:07cv150

**CITY OF PORTSMOUTH**

**and**

**FIRE CHIEF NEWELL WHITEHEAD,**

    **Defendants.**

## ORDER AND OPINION

Pending before the court are the parties' cross-motions for summary judgment, filed with attached exhibits pursuant to Rule 56 of the Federal Rules of Civil Procedure. After examination of the briefs and record, this court determines that oral argument is unnecessary because the facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. The court, for the reasons stated fully herein, **GRANTS** the defendants' motion for summary judgment. Accordingly, the plaintiff's motion for summary judgment is **DENIED** as **MOOT**.

I. Factual Background

The plaintiff, Jeanette Marie Hentze, was employed by the defendant City of Portsmouth (hereinafter "the City") as part of the Portsmouth Department of Fire, Rescue, and Emergency Services (hereinafter "the Fire Department"), from 1989 until her retirement in 2007. The plaintiff retired as a result of certain work-related injuries to her foot, and as a result, she has

received and continues to recover compensation under the Virginia Workers' Compensation Act ("VWCA") Va. Code Ann. § 65.2-101.  On August 2, 2004, while stepping on a parking lot curb as she entered the Fire Department administrative building, the plaintiff injured her right foot.  As a result of that injury, on August 5, 2005, the plaintiff underwent surgery that was also covered by the VWCA.  At the time of her injury, she had been serving as the Logistics Officer with the Fire Department, but the plaintiff requested a transfer back to active fire suppression duty around August 2005.  Defendant Fire Chief Newell Whitehead (hereinafter "Chief Whitehead") granted that request, and she was subsequently reassigned to Station 3, the Marine Patrol.

After her August 2005 surgery, the plaintiff began wearing a special orthotic in her shoe.  The plaintiff was satisfied with how the orthotic fit into both her dress shoes and her "station" boots, the boots that she would typically wear around the fire station, but not when responding to fire calls.  However, the plaintiff was not satisfied with how the orthotic fit with her turnout boots,[1] the boots that she would wear when responding to certain fire suppression calls.  In response, the plaintiff did not complain about the boots or the orthotic, but instead tried to wear another pair of socks, and when that did not prove comfortable, "just sucked it up."  Deposition of the Plaintiff, Exhibit A to Defendants' Motion for Summary Judgment, at 103.  At some point in November of 2005, the plaintiff had a conversation with a female firefighter in the Norfolk

---

[1] The parties agree that the turnout boots stocked and issued by the Portsmouth Fire Department at the times relevant to this litigation were Black Diamond firefighter boots, Model # 690-9451.  The Black Diamond boots were numbered according to traditional men's shoe sizes, but were designed and intended to be worn by both men and women.  See, e.g., Exhibit 33 to Plaintiff's Motion for Summary Judgment (email from Black Diamond explaining how to calculate the proper size boot for a woman).

Fire Department, during the course of which the plaintiff learned for the first time that certain companies marketed turnout boots specifically to women. On November 10, 2005, the plaintiff called the Fire Department's logistics officer, Lieutenant Mike White, and left him a voice mail message in which she indicated that she needed to order a new boot because her orthotic did not fit her turnout boot. Instead of waiting to hear back from Lt. White, the plaintiff went to the Fire Department's local supplier of the boots and ordered another boot, sized 6.5. On November 12, 2005, Lt. White returned the plaintiff's phone call, but did not reach her and instead left her a voice mail message, in which he indicated that he would check to see what sizes of boot the Fire Department had in stock. Later on November 12, the plaintiff conversed with Lt. White by telephone, at which point she requested that the Fire Department order turnout boots sized for women.[2] Lt. White informed the plaintiff that he would look for women's boots at the Fire Department storage facility.

During the course of responding to a fire call on November 18, 2005, the plaintiff re-aggravated the injury to her foot, although she was able to continue fighting the fire after the injury. She then contacted Lt. White, who met her at the station at which the extra boots were kept, and the plaintiff filled out a request to order a new pair of Black Diamond boots in a different size. The November 18 injury was found by the Workers' Compensation Commission to be a natural consequence of the plaintiff's August 2004 injury, and therefore she was awarded compensation for the effects of this injury. After recovering from the injury, the plaintiff returned to work and, on January 25, 2006, emailed Chief Whitehead to request that the Fire

---

[2]The defendants dispute that this conversation ever occurred, but its occurrence does not preclude summary judgment in the defendants' favor.

Department "look into providing turnout boots" that were marketed specifically to women.[3] Exhibit I to Defendants' Motion for Summary Judgment. In response, Safety Officer Mike Stockton reviewed the plaintiff's request and did not recommend providing the Ranger boot as an option offered to Portsmouth firefighters. Chief Whitehead also reviewed the request, reviewed information available on the internet, and communicated with Black Diamond, confirming his belief that the continued use of Black Diamond boots was appropriate. On January 26, Chief Whitehead emailed the plaintiff and advised her that the Fire Department did not have any plans to purchase the Ranger boot, but reminded her of the policy by which she could purchase an approved boot of her choice.

On February 3, 2006, the plaintiff's request for use of the Ranger boot was approved. The plaintiff acknowledges that she did not request that the City reimburse her for the purchase of the Ranger boots, and that when contacted by the Fire Department about being reimbursed through the Workers' Compensation process, she did not follow up. On March 20, 2006, the plaintiff sustained another injury to her right foot, but she was not wearing her turnout boots. She was again awarded compensation under the VWCA, and as a result of the injury, underwent a second surgery, in April of 2006. After the injury, the plaintiff returned to the Fire Department in a light duty position for most of 2006. The plaintiff applied for and was granted service-related disability retirement benefits as of March 1, 2007.

II. Procedural History

On April 4, 2006, the plaintiff filed a charge of discrimination against the City and Chief

---

[3] At around this time, aware of a policy that the Fire Department had in which firefighters could fill out an application to use different equipment, the plaintiff ordered a pair of boots from Ranger that were marketed specifically toward women.

Whitehead with the Equal Employment Opportunity Commission, and specifically alleged that the City had discriminated against her on the basis of her sex by failing to provide her the requested boot after her January 25, 2006 letter. On March 12, 2007, the plaintiff was issued a right to sue letter by the EEOC. She filed the instant complaint in this court on March 23, 2007, against the City and the Fire Department. After the Fire Department was dismissed as a defendant, the plaintiff obtained leave of court and amended its complaint to join Chief Whitehead as a defendant. Count I of the Amended Complaint states a claim against the City for unlawful gender discrimination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. Count II of the Amended Complaint alleges that the City and Chief Whitehead, in his official and individual capacities, violated 42 U.S.C. § 1983 by discriminating against the defendant because of her gender.

The plaintiff filed a motion for summary judgment[4] on November 13, 2007, to which the defendants responded on November 29, 2007. The plaintiff filed a reply brief in support of her motion on December 4, 2007. Meanwhile, the defendants filed a motion for summary judgment on November 15, 2007, the plaintiff filed a response brief on November 29, and the defendants filed a reply brief on December 4. The cross-motions for summary judgment are therefore ripe for consideration.

III. Standard of Review

Summary judgment under Federal Rule of Civil Procedure 56 is only appropriate when

---

[4] It is noted that the plaintiff does not seek summary judgment as to the claims in the amended complaint, but rather seeks to "narrow the issues for trial," by obtaining the court's approval as to, inter alia, the admissibility of certain evidence and the ability to recover damages despite receiving workers' compensation.

the court, viewing the record as a whole and in the light most favorable to the non-moving party, determines that there exist no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law.  See, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-50 (1986); Terry's Floor Fashions, Inc. v. Burlington Indus., Inc., 763 F.2d 604, 610 (4th Cir. 1985).  In Title VII cases, the Fourth Circuit, although cautioning against overuse, has determined that summary judgment may be entered if there are no genuine issues of material fact.[5]  See Ballinger v. North Carolina Agric. Extension Ser., 815 F.2d 1001, 1005 (4th Cir. 1987).

Once a party has properly filed evidence supporting the motion for summary judgment, the non-moving party may not rest upon mere allegations in the pleadings, but must instead set forth specific facts illustrating genuine issues for trial.  Celotex Corp., 477 U.S. at 322-24.  Such facts must be presented in the form of exhibits and sworn affidavits.  Failure by the plaintiff to rebut the defendants' motion with such evidence will result in summary judgment.  "[T]he plain language of Rule 56 mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Id. at 322.  Although the moving party bears the initial burden of stating the basis for its motion, that burden can be discharged if

---

[5]The defendants dispute the propriety of the plaintiff's motion for summary judgment and contend that, because the plaintiff seeks no resolution on any claim, but rather on "issues" relating to the scope of claims, a motion for summary judgment is an improper vehicle to achieve the plaintiff's desired ends.  Instead, the defendants argue that the plaintiff has really brought several motions in limine under the improper guise of a motion for summary judgment.  Because the court finds that summary judgment in favor of the defendants as to each of the plaintiff's claims is appropriate, it declines to rule on the matters presented in the plaintiff's motion for summary judgment and on the propriety of such a motion to narrow the issues to be addressed at trial.

the moving party can show "an absence of evidence to support the non-moving party's case." Id. at 323, 325. After the moving party has discharged the burden, the non-moving party must then designate specific facts showing that there is a genuine issue of material fact. Id. at 324.

To enter summary judgment, a court does not need to determine that there are no factual issues in dispute. To find against the moving party, however, the court must find both that the facts in dispute are material and that the disputed issues are genuine. A factual dispute is deemed to be material if it is dispositive of the claim. See Thompson Everett, Inc. v. National Cable Advertising, L.P., 57 F.3d 1317, 1323 (4th Cir. 1995). Similarly, a factual dispute is considered genuine if it is based on more than speculation or inference. Celotex Corp., 477 U.S. at 327; Runnebaum v. NationsBank of Md., N.A., 123 F.3d 156, 164 (4th Cir. 1997) (en banc), overruled on other grounds by Bragdon v. Abbott, 524 U.S. 624 (1998).

While it is the movant's burden to show the absence of a genuine issue of material fact, Pulliam Investment Co., Inc. v. Cameo Properties, 810 F.2d 1282, 1286 (4th Cir. 1987), it is the non-movant's burden to establish the existence of such an issue. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-587 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. To survive summary judgment, the non-moving party must present evidence that is "significantly probative." Celotex Corp., 477 U.S. at 327. More specifically, "a genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct." Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984) (citing Radobenko v. Automated Equipment Co., 520 F.2d 540, 544 (9th Cir. 1975)).

Further, "speculation is not sufficient to defeat a summary judgment motion." <u>Ash v. United Parcel Svc., Inc.</u>, 800 F.2d 409, 411-12 (4th Cir. 1986).

IV. Analysis

Because a prima facie case under § 1983 is made in the same fashion as under Title VII, the court will analyze the plaintiff's Title VII and § 1983 claims together. As the plaintiff's Title VII claim fails to withstand summary judgment when considered on its merits, so the plaintiff's § 1983 claim also must fail.

The plaintiff's claims of employment discrimination fall under the rubric of Title VII and § 1983. Title VII prohibits employers from failing or refusing to hire or discharging any individual, or otherwise discriminating against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1). Employers are also forbidden to "limit, segregate, or classify [their] employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(2). 42 U.S.C. § 1983 similarly prohibits a person from acting under color of state law to deprive another of rights ensured by the Constitution or federal statutes.

The plaintiff's claim of gender discrimination boils down to one central argument: that she was subject to disparate treatment at the hands of her employer because of her gender. A plaintiff may establish a claim of discrimination or retaliation in one of two ways. First, the plaintiff may present direct or indirect evidence of the discriminatory animus alleged. <u>Brinkley</u>

v. Harbour Recreation Club, 180 F.3d 598, 607 (4th Cir. 1999).  In order to defeat summary judgment, the plaintiff must demonstrate "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision."  Fuller v. Phipps, 67 F.3d 1137, 1142 (4th Cir. 1995).

If such evidence is not available to the plaintiff, she may rely on the burden-shifting scheme as articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) and its progeny.  This scheme requires the plaintiff to establish a prima facie case of discriminatory action, which gives rise to a presumption of discrimination.  Id. at 802.  Establishment of this presumption shifts the burden to the defendant to produce a legitimate, non-discriminatory reason for its action.  Id. at 802-03.  It is a burden of production, as opposed to a burden of proof, that the defendant has.  If it meets this burden of production, the presumption of discrimination vanishes, and the plaintiff must show that the employer's proffered explanation is simply a pretext for intentional discrimination.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000).

"An employer is entitled to summary judgment if the plaintiff fails to establish a prima facie case of discrimination" or fails to show that the employer's proffered legitimate non-discriminatory reason is unworthy of belief.  Henson v. Ligget Group, Inc., 61 F.3d 270, 274 (4th Cir. 1995); see also Reeves, 530 U.S. at 143.  If "no rational fact-finder could conclude that the action was discriminatory," the plaintiff cannot withstand the defendant's motion for summary judgment.  Id. at 148.  Here, the plaintiff has not presented any direct or indirect evidence of a discriminatory animus on the part of the employer, and therefore must rely on setting out a prima facie case.

A. Disparate Treatment

To establish a prima facie case of disparate treatment based on race, color, sex, or age, the plaintiff must show that (1) she is a member of a protected class; (2) she was subject to an adverse employment action; and (3) she was treated differently than similarly situated employees outside of her protected class. Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981). Here, the plaintiff, who is a woman, is clearly a member of a protected class. However, she cannot demonstrate that she was subject to any adverse employment action. An adverse employment action stems from an employer's conduct that materially alters the terms, conditions, or benefits of employment. Von Gunten v. Maryland, 243 F.3d 858, 866 (4th Cir. 2001). An inquiry into the adverse nature of an employer's action ordinarily focuses on whether the employee has suffered termination, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or decreased opportunities for promotion. Boone v. Goldin, 178 F.3d 253, 255 (4th Cir. 1999). "[D]ecisions having no immediate effect upon employment conditions . . . were not intended to fall within the direct proscription of [Title VII]." Page v. Bolger, 645 F.2d 227, 233 (4th Cir. 1981) (en banc).

The plaintiff claims that at several points she interacted with her superiors in the Fire Department in an attempt to have the Fire Department provide her with turnout boots that were marketed toward women. She argues that, each time, she was informed that the Fire Department had no plans to stock any other boots than the Black Diamond turnout boots that it had been providing to its firefighters for years. Although the plaintiff argues that this refusal to provide her with the boots she requested constitutes an adverse employment decision, it is clear that the Fire Department did indeed permit her to purchase the boots for herself, an opportunity of which

the plaintiff availed herself.  See Permission Form Regarding Non-Departmental Issue Structural Firefighting Footwear, Exhibit C to Defendants' Motion for Summary Judgment (indicating the plaintiff's request to wear the Ranger turnout boots she had purchased); email of January 26, 2005 from Chief Whitehead to the Plaintiff, Exhibit K to Defendants' Motion for Summary Judgment (reminding the plaintiff of the Fire Department's policy for those who wish to wear non-issued footwear).  The plaintiff further admitted in her deposition that, when contacted by the City's HR Department about compensating her for the purchase of the Ranger boots, she failed to follow up.  Deposition of the Plaintiff, Exhibit A to Defendants' Motion for Summary Judgment, at 163-64.  Accordingly, the evidence tends to show that, rather than denying the plaintiff her choice of turnout boots, the defendants merely refused to stock that specific type of boot.  Yet the plaintiff was free to–and did–purchase the Ranger boot for herself, and she received permission to use the boot during the course of her firefighting duties.

Yet even if the City did refuse to purchase boots that were specifically designed for women, the plaintiff does not–and cannot–demonstrate that this rises to the level of an "adverse employment action."  Indeed, the failure to provide boots that were specifically marketed to women does not relate to "termination, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or decreased opportunities for promotion," such as would ordinarily constitute an adverse employment action.  Boone, 178 F.3d at 255 (4th Cir. 1999).  The refusal to stock a certain type of turnout boot simply fails to rise to the level of an "ultimate employment decision"–the plaintiff kept her job at the same pay and benefits level, and in fact was free to purchase the desired boot herself.

Even further, although the plaintiff seeks to tie her November 18, 2005 injury, which was

sustained while wearing the Department-issued Black Diamond boots, to the City's decision on January 26, 2006 to deny her request that it stock a boot specifically for women, she runs into the obvious problem that the injury occurred two months prior to the City's denial. Although the plaintiff now alleges that she made certain complaints about the poor fit of the Black Diamond boots prior to January 2006, the actual substance of those complaints makes clear that the plaintiff was not upset that the Fire Department did not provide a boot specifically for women;[6] rather, she–and other firefighters, male and female–were upset about the way the Black Diamond boots fit on their feet. The plaintiff testified at her deposition that, when she was Logistics Officer of the Fire Department, she "had a couple of complaints from both male and female [sic]. One of the females told me that the boots were tearing her toe nails [sic] off, and the gentlemen were saying that the boots just didn't fit them right." Deposition of the Plaintiff, Exhibit 1 to Response to Defendants' Motion for Summary Judgment, at 75. The plaintiff then indicated that, as a follow-up, she spoke to Chief Whitehead and "asked him if we could look at doing something with the boots because both guys and girls were complaining about them, and they didn't seem to fit them properly." Id. at 75-76.[7]

---

[6]Indeed, the plaintiff admitted at a deposition that the first time she learned that there were boots that were marketed specifically to women was "about November of 2005." Deposition of the Plaintiff, Exhibit A to Defendants' Motion for Summary Judgment, at 65. Accordingly, although the plaintiff now claims that she talked with Chief Whitehead in or about April of 2005, at which time she "requested that women's firefighter turnout boots be provided to her and other female firefighters," Plaintiff's Response to Defendants' Motion for Summary Judgment at 21, this claim is flatly contradicted by her own admission that she did not even know such boots existed until November of 2005.

[7]The plaintiff's own testimony indicates that she was not treated any differently than similarly situated firefighters outside of her protected class. Rather, the plaintiff has established that both male and female firefighters did not like the fit of the Black Ranger turnout boots. She also acknowledged that, under the Fire Department's policy, both male and female firefighters

At a later point in her deposition, the plaintiff discussed the voice mail she had left for Lieutenant Mike White on November 10, 2005, in an effort to obtain a new boot in which her orthotic would fit properly. And while the plaintiff indicated that she asked Lt. White for women's boots because she believed that would solve the problem with her orthotic not fitting properly, she has not alleged that Lt. White was in a position to make the decision for the Fire Department and the City to begin stocking the boots that the plaintiff desired. In fact, Lt. White, who was then serving as the Department's Logistics Officer, had replaced the plaintiff in that position, and the plaintiff indicated that the Logistics Officer functioned as a "peon," with no authority to determine what type of equipment the Fire Department would issue. Id. at 67-68. Because Lt. White, by the plaintiff's own testimony, was not in a position to make an "ultimate employment decision," his action in failing to obtain the boots that the plaintiff requested cannot be considered an "adverse employment action."[8]

It was not until the plaintiff sent an email to Chief Whitehead on January 25, 2006, requesting that the department stock turnout boots that were marketed specifically to women, that the person or persons in the Fire Department with authority to make that determination were actually notified of the plaintiff's request. Chief Whitehead's decision, after consulting with representatives of Black Diamond about the suitability of its boots for female firefighters, was to

---

were eligible to apply for approval to use a different type of boot. Deposition of the Plaintiff, Exhibit A to Defendants' Motion for Summary Judgment, at 80-81. Further, she was keenly aware of this policy, having collected some of the requests submitted by firefighters during her time as the Department's Logistics Officer.

[8]To the extent that the plaintiff suggest that Lt. White had more authority as Logistics Officer than the plaintiff did while serving in the same position, such contention finds not support in the record before the court.

13

deny the plaintiff's request. However, the injury that the plaintiff claims was caused by the improperly-fitting boots had occurred more than two months prior to the City's denial of the plaintiff's request that it stock a different brand of boots. Although the plaintiff attempts to link the City's January 26, 2006 denial of her request with the failure to stock the requested type of boots prior to her November 18, 2005 injury, she cannot avoid the fact that the alleged "adverse employment action" could not have caused an injury that had already occurred.

Although the plaintiff cites several cases in support of her claim that failure to provide proper equipment may constitute discrimination under Title VII, the cases are inapposite. In Keefer v. Univ. Forest Prods., Inc., 73 F.Supp.2d 1053 (W.D. Mo. 1999), the plaintiff had argued that the employer's failure to provide her with a brace and gloves that fit her constituted unlawful gender discrimination. However, the court rejected this contention, and noted that the record indicated that the defendant had suggested certain curative measures. Id. at 1057. In the instant case, the defendants offered the plaintiff the opportunity to purchase her preferred boots–an offer that the plaintiff accepted–and then offered to reimburse her for the cost of the boots–an offer that she failed to accept. Accordingly, Keefer supports the conclusion that the plaintiff cannot demonstrate any adverse employment actions taken by the defendants.

In Schmidt v. Montgomery Kone, Inc., 69 F.Supp.2d 706, 714 (E.D. Pa. 1999), the plaintiff's allegations of denial of proper equipment came in the context of a claim that his employer had retaliated against him after he filed a charge with the EEOC. Accompanying that claim was deposition testimony from the plaintiff's supervisor, who admitted that the acts were retaliatory. Id. Similarly, in Seebald v. Praxair, Inc., 2004 WL 350912 (E.D. Pa. 2004), the plaintiff alleged that his employer retaliated against him for filing an EEOC charge by not

replacing damaged equipment.  The plaintiff had also produced evidence of numerous alleged adverse employment actions, and the court was persuaded that there existed a genuine dispute of material fact such that summary judgment was inappropriate.  Id. at *12.  In contrast, the plaintiff in the instant case has produced no evidence that the City's decision to deny her the boots she requested was based on her gender.  Rather, the record indicates that the City had concluded that the Black Diamond boots were suitable for both male and female firefighters, and that the plaintiff did not begin experiencing difficulty with the boots until she began wearing the orthotic.  Further, the plaintiff relies on a single alleged adverse employment action to support her claim.

Gawley v. Indiana Univ., 276 F.3d 301 (7th Cir. 2001), is similarly distinguishable.  In that case, the court sustained the grant of summary judgment where the plaintiff had failed to preserve her claims by raising them before the EEOC.  The court included a footnote that indicated that, had the plaintiff properly preserved this claim, it might have formed the basis for a valid claim for constructive discharge.  Id. at 316 n.9.  Although such a claim could proceed on the basis "that the employer delayed the issuance of critical safety equipment on the basis of gender or race," id., the plaintiff in the instant case has utterly failed to make such a showing.  Finally, the plaintiff cites Derasmo v. City of Gainesville, 1998 WL 798649 (N.D. Fla. 1998), which, although it involves a female firefighter, includes no allegations of denial of proper equipment.  Further, the court in Derasmo found the record to be "replete with comments and actions supporting the conclusion that many of plaintiff's supervisors shared an antipathy toward females being firefighters."  Id.  In contrast, the record in the instant case is entirely lacking evidence that supports the conclusion that the plaintiff's supervisors had any animus toward her

because of her sex.[9]

Further damaging to the plaintiff's case is the fact that she had worn the Fire Department-issued Black Diamond turnout boots for several years prior to 2005, yet only began to experience difficulty with the fit of the boots once she had been fitted with the orthotic after her 2004 injury. Deposition of the Plaintiff, Exhibit 1 to Defendants' Reply Brief, at 102. Instead of demonstrating that the Fire Department's choice of boots was discriminatory against women, this fact instead appears to raise the specter of disability discrimination, yet it is clear that the plaintiff is solely alleging discrimination on the basis of her gender. See Deposition of the Plaintiff, Exhibit A to Defendants' Motion for Summary Judgment, at 261 (indicating the plaintiff's belief that she should have been provided her preferred boot because it was a "reasonable accommodation" for her previous injury).

Even assuming, arguendo, that the plaintiff was capable of making a prima facie case of disparate treatment, the defendants have offered legitimate, non-discriminatory reasons to support their actions. The Black Diamond boot, which from the record appears certified by the National Fire Protection Association,[10] an organization that makes recommendations regarding

---

[9]Indeed, there is no evidence that Chief Whitehead or anyone else used any language that might be considered discriminatory toward the plaintiff, nor has the plaintiff produced anything beyond her bare allegations that would support an ulterior motive for the City's decision to deny her request that the Fire Department begin supplying its firefighters with a boot marketed specifically to women.

[10]The plaintiff appears to contend that the Black Diamond boots are not NFPA-complaint, but fails to explain why the Fire Department would be required to conduct further research into this question when the boots themselves indicate NFPA compliance, and all communication from the manufacturer also indicates that the boots are NFPA-complaint. See, e.g., Exhibit 33 to Plaintiff's Motion for Summary Judgment (email from Black Diamond stating that the boots are NFPA-compliant).

firefighting equipment, is designed to fit both men and women. See, e.g., Exhibit 33 to Plaintiff's Motion for Summary Judgment (email from Black Diamond explaining how to calculate the proper size boot for a woman); Deposition of Chief Whitehead, Exhibit F to Defendants' Motion for Summary Judgment, at 24 (indicating that Black Diamond representatives told him "their boots were men's and women's, that there were two sizes different between a man's and a woman's boot, but the same boot, that some manufacturers put a 'W' on it because people asked for that, but it was all the same boots [sic]"). Although the plaintiff argues that these explanations are merely pretexts for actual discrimination, she supports this contention by claiming that male firefighters were given boots that were sized for men, whereas female firefighters were required to purchase their own boots if they desired boots that were marketed specifically toward women.[11] Yet once again, it is clear that, although the Black Diamond boots used numbers that corresponded to traditional men's sizing, the boots were unisex in every other respect. Even further, the Fire Department's policy regarding alternate footwear is clearly gender-neutral, and in fact the plaintiff has acknowledged that both men and women did not like the fit of the Black Diamond boots. In declining to stock the Ranger boot that the plaintiff had requested, Chief Whitehead referred to this policy as an alternative means by which the plaintiff might obtain a boot that would better fit her orthotic. See email of January 26, 2005 from Chief Whitehead to the Plaintiff, Exhibit K to Defendants' Motion for Summary Judgment. Accordingly, the plaintiff cannot demonstrate that the defendants' proffered non-discriminatory reasons are anything other than true. Thus, summary judgment is appropriate in

---

[11] Of course, this is the same argument that the plaintiff has proffered in an attempt to set out a prima facie case of discrimination, and because it fails in that regard, it must also fail as evidence of pretext on the part of the defendants.

favor of the defendants.

B. Qualified Immunity

The plaintiff has sued Chief Whitehead in his individual capacity under Section 1983, and the plaintiff has argued that such a claim is barred by the doctrine of qualified immunity. Qualified immunity operates to shield government officials from civil liability when performing discretionary duties "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In this case, Chief Whitehead is entitled to qualified immunity because he relied on the representations of the makers of the Black Diamond boot, and on information from his Logistics Officers and safety officer, that the boot was suitable for firefighters of both gender, and such reliance was objectively reasonable. Accordingly, the plaintiff's claim against Chief Whitehead in his individual capacity cannot withstand summary judgment.

C. Injunctive Relief

The amended complaint requests relief in the form of an injunction requiring the City to provide to its firefighters boots that are specifically marketed toward women. The parties agree that, as of October 1, 2006, the City now provides all firefighters with the choice of either the Black Diamond boots or the Ranger boots requested by the plaintiff. Accordingly, because the plaintiff cannot demonstrate that this alleged violation of Title VII is likely to occur, the request for injunctive relief is moot. See Spencer v. Gen'l Elec. Co., 894 F.2d 651 (4th Cir. 1990).

D. The Plaintiff's Motion for Summary Judgment

As indicated supra, the plaintiff has filed a motion for summary judgment in an effort to

narrow the issues to be presented at trial. Because the plaintiff's motion does not seek an ultimate pre-trial disposition of the case, and because the court has found that the defendants are entitled to summary judgment as to all of the claims in the amended complaint, the court finds that the plaintiff's motion must be denied as moot.

V.  Conclusion

Because the plaintiff cannot make a prima facie case for gender discrimination, and cannot establish that the defendants acted with anything but non-discriminatory motives in denying her requests for a different type of boot, summary judgment in favor of the defendants is appropriate. Accordingly, the court **GRANTS** the defendants' motion for summary judgment as to the entire complaint, and the claims therein are **DISMISSED.** Further, the court **DENIES** as **MOOT** the plaintiff's motion for summary judgment.

The Clerk is **REQUESTED** to send a copy of this Order to counsel of record for all parties.

It is so **ORDERED**.

/s/
Jerome B. Friedman
UNITED STATES DISTRICT JUDGE

December 18, 2007
Norfolk, Virginia